```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

MICHAEL R. CLARK,                   :      No. 1:12-cv-00218
                                    :
      Plaintiff,                    :
                                    :
                                    :
      v.                            :      **OPINION AND ORDER**
                                    :
                                    :
EVERGREEN SOUTHWEST BEHAVIORAL      :
HEALTH SERVICES, LLC, d/b/a/        :
BRIDGEWELL HOSPITAL                 :
                                    :
      Defendant.                    :

This matter is before the Court on Defendant's motion for summary judgment (doc. 16), Plaintiff's memorandum in opposition (doc. 28), Defendant's reply (doc. 45) and Plaintiff's sur-reply (doc. 49), filed with the Court's permission (doc. 48). For the reasons that follow, Defendant's motion is DENIED.

    **I.  BACKGROUND**

On March 7, 2011, Plaintiff Michael R. Clark began his employment as a registered nurse with Defendant Evergreen Southwest Behavioral Health Services, LLC, doing business as Bridgewell Hospital ("Bridgewell") (Complaint with Jury Demand (doc. 1) ¶¶7, 9; Affidavit of Michael Clark (doc. 30) ¶1). He alleges he was forced to resign, and thus constructively discharged, on August 30, 2011 (doc. 1 ¶8). During his brief tenure at Evergreen, Plaintiff entered into a consensual sexual

relationship with Lisa Cantor-Jacobson ("Cantor"), the physician in charge of patient care at Bridgewell. Their relationship began in July 2011; at some point thereafter, Cantor was appointed Acting Medical Director/Administrator when Dr. Toni Carmen took a medical leave of absence. On August 24, 2011, Plaintiff advised Cantor that he wished to end their liaison. (Doc. 1 ¶¶10-11 & Exh. A at 2 ¶¶5-6; Affidavit of Gloria Charlier (doc. 29) ¶7; Clark aff. ¶5-6; doc. 28 at 9 n.4.) She became sarcastic with him, admonishing him in front of other employees, and told him to "shut up" when he asked questions related to patient care (Clark aff. ¶7). Gloria Charlier was the Director of Nursing at Bridgewell and Plaintiff's supervisor and manager (Charlier aff. ¶2; Clark aff. ¶¶3, 5).[1] On August 29, 2011, Cantor came to Charlier's office, requesting a meeting. Besides Cantor and Charlier, Human Resource Manager Mike Bonfield attended. Cantor became very emotional, putting her hands up to her forehead and shaking. She stated that she wanted Plaintiff fired. Charlier was confused by this request inasmuch as, a few weeks earlier, Cantor had complimented Plaintiff's clinical skills, telling Charlier that he was the only registered nurse there "who really knew what [he was] doing." Cantor had even asked that Plaintiff be placed on a

---

[1] Charlier left Bridgewell's employ on October 31, 2011 (Charlier aff. ¶1).

2

"treatment team" that was charged with making important patient care decisions at their facility. (Charlier aff. ¶7.) At the August 29th meeting, presumably by way of explanation, Cantor told Charlier that some of the nursing staff regarded Plaintiff as "too rigid" and they "did not like him telling them what to do." Charlier replied that, in her judgment, the nursing staff was adverse to "anyone" giving them direction, citing to complaints surrounding a female registered nurse who worked second shift. Charlier asked Cantor to explain the difference between Plaintiff, who worked first shift, and the female who worked second. Cantor responded that "she could not explain, but there was a difference." She repeated that she "just wanted him fired." (Charlier aff. ¶8.) The meeting ended with Charlier offering to switch the female registered nurse to first shift and Plaintiff to second. This action would separate Plaintiff from Cantor, who worked first shift. (Charlier aff. ¶9.)

To put things in motion, Charlier first called the female registered nurse; she was "upset" with the switch, but Charlier told her she thought it best to at least try out the new assignment for a couple of weeks. Charlier then called Plaintiff. When he questioned why the switch, Charlier told him point blank that Cantor wanted him fired. Plaintiff responded that it was unfair and retaliatory to make him change shifts.

3

When Charlier asked him to explain his remarks, he stated, "'Lisa and I had an affair and I broke it off recently, now she is trying to get back at me'" using her "power" as Acting Medical Director/Administrator. (Charlier aff. ¶10; Clark aff. ¶¶8-10.) Unsure of how to move forward, Charlier told Plaintiff she was going to call Don Sykes[2] and then be back in touch with him (Charlier aff. ¶10). Sykes advised her to not go through with the shift change and, when she had the opportunity, to ask Cantor if she ever saw Plaintiff outside the workplace. Sykes indicated that "'[i]f she says no, then we have caught her in a lie and we could confront her with it.'" (Charlier aff. ¶11.)

The next day, August 30th, Charlier encountered Cantor in a hospital hallway. Cantor appeared very agitated. Charlier later observed her on her cell phone, pacing back and forth. Around 3:00 p.m., Cantor stood in Charlier's doorway and screamed, "'Emergency Meeting in the Conference Room.'" (Charlier aff. ¶12.) Attending the meeting were Charlier, Cantor and Bonfield, as well as the first shift hospital staff with whom Cantor had just worked. It appeared to Charlier than Cantor had coached these employees to complain about Plaintiff, and she found their criticisms without merit. For example, a

---

[2] Sykes was Charlier's supervisor, with whom she consulted weekly about personnel issues. He also was a member of Bridgewell's "management and ownership team[.]" (Charlier aff. ¶10.)

4

housekeeper protested that Plaintiff would not allow her to answer the telephone at the nurses' station; Charlier rejoined that, indeed, housekeepers were not supposed to answer that telephone. (Charlier aff. ¶13.) When the first shift staff and Bonfield left, Cantor told Charlier again that she wanted Plaintiff to be fired immediately. Following Sykes' instruction, Charlier asked Cantor if she ever saw Plaintiff "outside of Bridgewell[.]" Cantor denied any such contact, but stated that Plaintiff had given her a "stupid cheap necklace" that she, in turn, gave to her daughter "to play with[.]" (Charlier aff. ¶14.) Charlier then telephoned Sykes with an update. Sykes indicated he needed to consult with Geoffrey Webster.[3] Later that afternoon, Sykes contacted Charlier and stated that, as a result of his conversation with Webster, "'Someone is going to have to fall on the sword. It is either going to have to be Michael Clark or you and Dr. Carmen.'" He then asked whether he should call Plaintiff or whether she would. Charlier volunteered to do so; she testified that Plaintiff told her, "'I can't let that happen to you and Dr. Carmen; I will be the one to fall on the sword.'" (Charlier aff. ¶15; Clark aff. ¶11.) Plaintiff tendered a letter of resignation that stated he was "leaving [his] position"

---

[3] Webster is the Managing Member of the Board of Directors that governs Bridgewell (Affidavit of Geoffrey E. Webster (doc. 16-1) ¶1).

5

effective August 31, 2011 (Affidavit of Geoffrey E. Webster (doc. 16-1) Exh. A). Cantor remained in Bridgewell's employ, never disciplined for her campaign to effect Plaintiff's termination.[4] (Doc. 1 ¶13 & Exh. A at 2 ¶8; Charlier aff. ¶18.)

In his Complaint, Plaintiff claims that he was discriminated against on the basis of his sex in violation of 42 U.S.C. § 2000e-2(a)(1) and Ohio Rev. Code § 4112.02(A) (Counts One and Three), and retaliated against for engaging in protected activity in violation of 42 U.S.C. § 2000e-3(a) and Ohio Rev. Code § 4112.02(I) (Counts Two and Three). As indicated, Defendant has moved for summary judgment, and the motion is ripe.

## II. SUMMARY JUDGMENT STANDARD

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

---

[4] Cantor resigned her position at Bridgewell in early fall, 2011 when Dr. Carmen returned from her medical leave ((Second) Affidavit of Geoffrey E. Webster (doc. 45-1) ¶3).

6

those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. Celotex, 477 U.S. at 331-32. As "the requirement [of the Rule] is that there be no genuine issue of material fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." Id. Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury

7

could reasonably find for the [non-movant]." Id. at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Companies, Inc., 8 F.3d 335, 339-40 (6th Cir. 1993) (applying Anderson, 477 U.S. at 249-50; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not our role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit us to assess the credibility of witnesses. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994) (citing Anderson, 477 U.S. at 255)).

### III. DISCUSSION

#### A. Sex Discrimination Claims

A Title VII plaintiff relying on circumstantial evidence must first make out a prima facie case of discrimination by

8

showing that: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; 3) he was qualified for the position held; and 4) either he was replaced by someone outside of the protected class or that similarly situated non-protected employees were treated more favorably. Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007). After the plaintiff has made out a prima facie case of discrimination, the employer must present a legitimate, nondiscriminatory reason for the adverse action. Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009). The burden of production then shifts back to the plaintiff to show that the employer's proffered nondiscriminatory reason was pretextual. Id. The burden of proof for a claim of sex discrimination under Ohio Rev. Code 4112.02 is the same as under Title VII. Staunch v. Cont'l Airlines, Inc., 511 F.3d 625, 631 (6th Cir. 2008); Shoemaker-Stephen v. Montgomery Cnty. Bd. of Comm'rs, 262 F. Supp. 2d 866, 874 (S.D. Ohio 2003). Thus, Plaintiff's federal and state sex discrimination claims are appropriately analyzed together.

For purposes of summary judgment, Bridgewell concedes that Plaintiff has met his prima facie case. It argues, however, that it had a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff from its employ had he not first resigned. Board member Webster maintains that, at their

9

request, he interviewed six current and former employees[5] of Bridgewell in August 2011 that either were supervised by Plaintiff or worked on the same floor during the same shifts as he. These employees initiated contact with Webster "to relay their personal knowledge of the inappropriate sexual harassment and racially charged environment Mr. Clark created while acting in a supervisory capacity at Bridgewell." (Webster aff. ¶¶1-2, 6.) Based on these interviews, Webster concluded that Plaintiff was guilty of sexual harassment. Further, Webster determined that Plaintiff had lied to him when completing affidavits in response to EEOC discrimination charges filed against Bridgewell by other employees.[6] (Webster aff. ¶7.) Finally, Webster decided that Plaintiff "had created a disruptive and racially charged atmosphere" at Bridgewell, and, apparently for this precise reason, resolved to discharge him (Webster aff. ¶8).[7] Webster admits to being aware of the gossip that Plaintiff was involved in a relationship with Cantor—as well as another female employee—but denies any investigation into this rumor or any influence on his choice to end Plaintiff's employ (Webster aff.

---

[5] Webster does not identify these individuals by name.

[6] To remedy this alleged deception, Webster testifies that he advised the EEOC that Bridgewell would not contest the claims involved and entered into settlement negotiations with the Commission as well as the charging parties (Webster aff. ¶7).

[7] As "Managing Member" of Bridgewell's governing board, Webster claims authority to terminate an employee without the consent of the other board members (Webster aff. ¶2).

¶¶3-5). He also denies any knowledge of Plaintiff's allegations that Cantor solicited meritless complaints from other employees for the purpose of effecting his termination or that Plaintiff had complained about Cantor's retaliatory conduct (Webster aff. ¶9).

A plaintiff can show pretext in three ways. See Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083-84 (6th Cir. 1994). First, he can show that the proffered reasons had no basis in fact. This first type of showing consists of evidence that the proffered basis for the adverse treatment never happened, i.e., that it was false. Second, a plaintiff can show that the reasons given by the employer were insufficient to motivate discharge. This second showing ordinarily consists of evidence that other similarly-situated individuals were more favorably treated. Third, he can show that the defendant's proffered reason did not actually motivate the adverse action. In order to make this third type of showing, the plaintiff must introduce additional evidence of discrimination. Id. at 1083-84.

The Sixth Circuit has cautioned that courts should "avoid formalism" in the application of the Manzer test, "lest on lose the forest for the trees." Chen, supra, 580 F.3d at 400 n.4. Pretext, the Court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This

11

requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." Id.

Without question, Plaintiff has satisfied his burden of production regarding pretext. The record is replete with evidence that raises a genuine issue of material fact as to whether Webster's explanation is a ruse. Both Plaintiff and Charlier deny that Plaintiff engaged in conduct that could be construed as sexual harassment of subordinate employees or that he created a disruptive and racially charged atmosphere at Bridgewell (Charlier aff. ¶3; Clark aff. ¶4). Charlier testified that it was her responsibility, as Director of Nursing, to investigate the facts alleged in support of the discrimination charges filed with the Ohio Civil Rights Commission ("OCRC") by Theophilas Barnes, LaShaun Dupee, Rhonda Gray, Paula Fields and Jacqueline Cobb. Her inquiry led her to conclude that the charges were without merit because each of these employees was discharged for violating company policy. (Charlier aff. ¶¶4, 18, 20-29.) In each instance, Charlier reported her findings to Webster as "the attorney for the hospital and a member of management[]" (Charlier aff. ¶5). Further, at no time during her employment at Bridgewell did Webster tell her that her investigations were flawed, or that Plaintiff had falsified any affidavits in connection with them

12

or that he, Webster, had conducted an independent investigation of any of the charging parties' allegations of discrimination and found them to be true (Charlier aff. ¶¶6, 19). Charlier also executed her own affidavits in connection with these charges that were similar in content to those signed by Plaintiff. Webster never accused her of being untruthful. (Charlier aff. ¶19.)

Defendant counters by submitting supplemental testimony by Webster. He again avers that he had no knowledge of Plaintiff's "affair with Dr. Cantor" or that Plaintiff "had complained to Charlier about Cantor's alleged retaliatory actions[]" ((Second) Affidavit of Geoffrey E. Webster (doc. 45-1) ¶2). He also identifies the other female employee with whom Plaintiff was rumored to be having a sexual relationship, namely Charlier, in a not-so-subtle attempt to cast doubt on her credibility (Webster aff. (II) ¶2). For the first time he claims that he spoke directly with Charlier on August 30, 2011 and instructed her to schedule a meeting with Plaintiff for the next day. According to Webster:

> I told Charlier that she should listen to whatever Clark had to say at that meeting, but that he would be fired. When I had this conversation with Charlier, I had no knowledge of the events that had allegedly taken place at Bridgewell on August 29 and August 30, 2011, as set forth in Gloria Charlier's affidavit (Doc. #29) and Michael Clark's affidavit (Doc. #30)[.]

(Webster aff. (II) ¶2.) Webster does not deny a conversation

13

with Sykes that day, but insists that "[he] had already, and well before speaking to [Sykes], made the decision to terminate Clark's employment, which [he] had communicated to Charlier earlier the same day[]" (Webster aff. (II) ¶4). Defendant argues that Charlier's testimony that Sykes "stated he had explained the issues to Webster that I had previously discussed with [him]" (Charlier aff. ¶15 (emphasis added)) is "extremely vague" and "falls far short of Clark raising a genuine issue of fact as to whether the hospital intentionally discriminated against him[]" (doc. 45 at 3).

    The Court disagrees. The timing of the decision to terminate Plaintiff, and precisely who knew what when, would seem to be the ultimate material fact in this case. It is incorrect, not to mention self-serving, for Defendant to posit that when Webster made his decision—purportedly after May 22 and prior to May 26—is "uncontroverted" (doc. 45 at 3). The trier of fact must determine whether Webster's testimony is credible in light of Charlier's, or whether Charlier's statements should be discounted because of a suspected romantic relationship with Plaintiff. Moreover, it would be improper for us to interpret whether "the issues" discussed between board members Sykes and Webster included Plaintiff's complaints about Cantor's retaliatory behavior. The inference to be drawn is far from "mere" but instead quite substantial, and the testimony, though

14

hearsay, would nonetheless be admissible under Fed. R. Evid. 801(d)(2).

Webster also asserts that he spoke again with Charlier on August 31, 2011 to ask if she had met with Plaintiff as instructed, because, if not, he would visit Bridgewell and meet with them both. According to Webster, upon Charlier's advice that Plaintiff already had tendered his resignation, Webster returned to his Columbus office. (Webster aff. (II) ¶6.) Plaintiff sought (doc. 46), and received (doc. 48), this Court's permission to file a sur-reply for the purpose of submitting additional testimony by Charlier. She denies any conversations with Webster on either August 30 or August 31, 2011, and bluntly labels his representations in this regard as "false[]" (see Declaration of Gloria Charlier (doc. 49-1) ¶¶3-5). This obvious conflict in testimony again requires an assessment of credibility by the trier of fact.

The Court is more than satisfied that Plaintiff has produced "significant probative evidence" from which a reasonable jury could conclude that Defendant's proffered reason for demanding that he resign or be fired was pretextual. See Moore, supra, 8 F.3d at 340. Summary judgment on Plaintiff's federal and state claims of sex discrimination, therefore, is not warranted.

15

**B. Retaliation Claims**

To establish a <u>prima facie</u> case of retaliation under Title VII, a plaintiff must demonstrate that:

> (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action.

<u>Lindsay v. Yates</u>, 578 F.3d 407, 418 (6th Cir. 2009) (citing <u>Evans v. Prospect Airport Servs</u>., Inc., 286 Fed. App'x 889, 894 (6th Cir. 2008)). As the statute provides, one can "engage" in protected activity in two ways:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] <u>has opposed</u> any practice made an unlawful employment practice by this subchapter, or because [the employee] <u>has</u> made a charge, testified, assisted, or <u>participated</u> in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). As our emphasis suggests, an employer may not retaliate against an employee who has "opposed" any practice made unlawful under Title VII or who has "participated" in a Title VII investigation. <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561, 578 (6th Cir. 2000). Whether an employee's actions fall within the "participation" clause or the "opposition" clause is a "significant" distinction. <u>Booker v. Brown & Williamson Tobacco Co.</u>, 879 F.2d 1304, 1312 (6th Cir.

16

1989). Employees who "participate" in proceedings are afforded "exceptionally broad protection" under the statute. Id. Less protection is afforded to employees who simply "oppose" practices made unlawful under Title VII. Id. at 1312-13. Key to a claim under the opposition clause is that the employee "reasonably believe[]" that the practice at issue be a violation of Title VII. Johnson, 215 F.3d at 579. Examples of protected "opposing" conduct have been delineated by the EEOC and include: (1) complaining to anyone, such as managers, union officials, fellow employees or members of the press, about allegedly unlawful practices; (2) refusing to obey an order on the basis that the employee believes it to be contrary to Title VII; or (3) objecting to the conduct of persons other than one's current employer, such as former employers, former collective bargaining agents or former fellow employees, that the employee believes to be in violation of Title VII. Id. (citing EEOC Compliance Manual (CCH) ¶ 8006). But, again, to receive protection, a plaintiff's opposition must actually concern conduct that he reasonably believes falls within the ambit of Title VII. See Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007) (construing retaliation provision of the Age Discrimination in Employment Act) (citing Booker, 879 F.2d at 1313 (Title VII)).

Plaintiff's retaliation claim obviously is brought

17

under the opposition clause. And the conduct that he professes to have opposed falls squarely within the realm prohibited by Title VII. It is undeniably a classic scenario. Plaintiff alleges that he ended a consensual sexual relationship with Cantor, the Acting Medical Director/Administrator of the hospital. Less than a week later, Cantor demands, without explanation, that his supervisor, Charlier, terminate him. In the course of trying to broker a less drastic personnel action, Charlier advises Plaintiff that Cantor wants him out; he, in turn, tells Charlier of his break-up with Cantor and claims he is being retaliated against for no longer wishing to be in a sexual relationship with the most senior administrator at the hospital. The very next day, Plaintiff is told that "'Someone is going to have to fall on the sword'" and he submits a coerced letter of resignation. Clearly, given this temporal proximity, Plaintiff has met his prima facie case. See Lindsay, supra, 578 F.3d at 418-20. As with his claim of sex discrimination, a jury will be charged with the task of deciding whether the same legitimate, nondiscriminatory reason tendered by Defendant denying not only impermissible sex discrimination, but also retaliation, is pretextual.

IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is hereby DENIED. Previously this Court

18

vacated the final pretrial conference and trial settings pending our ruling on the instant motion (<u>see</u> doc. 47). Accordingly, this matter is reset for a **final pretrial conference on May 22, 2014 at 2:00 p.m.**, with a **three-day trial scheduled for June 24, 2014**, on an on-deck basis.

    SO ORDERED.

Dated:  May 1, 2014       s/S. Arthur Spiegel_____
                                S. Arthur Spiegel
                                United States Senior District Judge